**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| The Appeal, Inc., <br><br>     Plaintiff, <br><br> v. <br><br> TYRONE OLIVER, Commissioner of the Georgia Department of Corrections; SHAWN EMMONS, Warden of the Georgia Diagnostic and Classifications Prison, and CHRISTOPHER M. CARR, Attorney General of the State of Georgia, <br><br>     Defendants. | Case No. 24-CV-01079-TCB <br><br> [On removal from the Superior Court of Fulton County, Georgia Case No.: 24CV003010] |

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff The Appeal, Inc. ("The Appeal"), by and through their counsel, file this Amended Complaint against Defendants Georgia Department of Corrections ("GDC") Commissioner Tyrone Oliver, Georgia Diagnostic and Classification Prison ("GDCP") Warden Shawn Emmons, and Georgia Attorney General Christopher M. Carr, and show this Honorable Court the following:

### PRELIMINARY STATEMENT

1.      This is a constitutional challenge to Defendants' practice of denying press, serving as the eyes and ears of the public, adequate witness access to the solemn governmental proceedings of a State execution. Defendants' various, arbitrary, and unnecessary restrictions to the execution process prevent Plaintiff and the public from being able to observe and obtain information

regarding key aspects of Georgia's execution process—including, most critically, incidents where complications and/or missteps might arise in the execution process.[1]

2.    Plaintiff The Appeal is a news outlet whose mission of reporting on criminal justice issues, including executions in Georgia, is frustrated if not outright denied by Defendants' existing restrictions on witness access to State executions.

3.    Plaintiff brings this action under  Article I, Section 1, Paragraph V and Paragraph XI of the Georgia Constitution of 1983 to enforce the public's right of access to observe—by both sight and sound—executions carried out by Defendants, including the immediately adjacent preparations and actions that are integral to and inextricably intertwined with the execution process, as described in Sections II(B)-(E) of the GDC Prison Lethal Injection Procedures (the "LI Procedures"), attached hereto as Exhibit 1.

4.    Plaintiff and the public depend on media witnesses' ability to see and hear the entire execution process to receive complete and accurate information regarding how the State carries out one of the gravest of responsibilities to which it is entrusted.

5.    Allowing media witnesses access to the entire execution process is consistent with Georgia's long history of public and media access to State executions, *see* Exhibit 2, and other significant government proceedings.

6.    Allowing media witnesses access to the entire execution process also helps ensure that executions by the State of Georgia are performed humanely and within the bounds of the law.

7.    Safeguarding the right of media witnesses—and, by extension, Plaintiff and the public—to see and hear the entire execution process vindicates the affirmative Georgia

---

[1] Plaintiff and undersigned counsel thank the University of Georgia Law First Amendment Clinic for their substantial contributions to this Complaint and litigation. Plaintiff and undersigned counsel further thank former First Amendment Clinic students Aradhana Chandra and Jack Beaman for their archival research compiling the information conveyed in Exhibit 2 to the Complaint.

constitutional right of "[e]very person" to "speak, write, and publish . . . on all subjects," including the subject of executions, Ga. Const. art. I, § 1, ¶ V; the Georgia constitutional prohibition stating that "[n]o law shall be passed to curtail or restrain the freedom of speech or of the press," Ga. Const. art. I, § 1, ¶ V; and the Georgia constitutional provision guaranteeing public criminal proceedings, Ga. Const. art. I, § 1, ¶ XI.

## JURISDICTION AND VENUE

8. This action arises under the Constitution and laws of the State of Georgia. This Court has subject matter jurisdiction over Plaintiff's claims pursuant to O.C.G.A. § 15-6-8.

9. Venue is proper in this Court under O.C.G.A. § 9-10-30.

10. This Court has authority to grant the equitable, declaratory, and injunctive relief pursuant to O.C.G.A. §§ 9-4-2; 9-4-3, 9-5-1, and the Georgia Constitution of 1983.

## PARTIES

11. Plaintiff The Appeal is a non-profit news organization based in California that was founded in 2018 and re-incorporated under new leadership in 2021. Covering exclusively criminal justice-related topics, The Appeal works to educate the public through fact-based investigative reporting. The Appeal has historically and consistently covered executions and the death penalty across the country and in Georgia specifically,[2] as well as criminal legal matters arising out of Georgia.[3] In order to report on executions in the State of Georgia, Plaintiff relies on the

---

[2] *See, e.g.,*Vaidya Gullapalli, *Spotlight: Marion Wilson's Execution Is a Grim Milestone*, The Appeal (Jun. 21, 2019), https://theappeal.org/spotlight-marion-wilsons-execution-is-a-grim-milestone/; Lauren Gill, *Georgia's Unique Death Penalty Law Is Killing the Mentally Disabled*, The Appeal (Feb. 23, 2022), https://theappeal.org/rodney-young-supreme-court-georgia-death-penalty/; Lauren Gill, *Missouri Executes Russell Bucklew Despite Threat of Botched Execution*, The Appeal (Oct. 2, 2019), available at https://theappeal.org/missouri-executes-russell-bucklew-threat-botched-execution/.
[3] *See, e.g.*, C. Dreams, *Georgia Prisoners Can Be Denied Vital Halfway House Placement Due To Medical Conditions*, The Appeal (Sep. 25, 2023), https://theappeal.org/georgia-prisoners-halfway-houses-transitional-centers-medical-issues/; Elizabeth Weill-Greenberg, *Medical Staff at Notorious Atlanta Jail Let Autistic Teen Waste Away and Die, Lawsuit Says*, The Appeal (Dec. 18, 2023), available at https://theappeal.org/fulton-county-jail-medical-staff-shane-kendall-death/.

contemporaneous accounts of the designated media witnesses to these solemn and significant governmental proceedings.

12.     Defendant Tyrone Oliver is the Commissioner of GDC. As Commissioner, Defendant Oliver is responsible for the supervision and direction of operations at GDC and has a duty to ensure that executions are carried out in compliance with GDC procedure and applicable law. Defendant Oliver is being sued in his individual capacity for violations of Article I, Section 1, Paragraph V and Paragraph XI of the Georgia Constitution of 1983.

13.     Defendant Shawn Emmons is Warden of GDCP, which is located in Butts County, Georgia, and is where GDC carries out all executions of condemned prisoners. As Warden, Defendant Emmons oversees the execution process and has a duty to ensure that executions are carried out in compliance with GDC procedure and applicable law. Defendant Emmons is being sued in his individual capacity for violations of Article I, Section 1, Paragraph V and Paragraph XI of the Georgia Constitution of 1983.

14.     Defendant Christopher M. Carr is the Attorney General of the State of Georgia. As Attorney General, Defendant Carr has a duty to ensure that executions are carried out in compliance with GDC procedure and applicable law. Defendant Carr or his designee is required to be present at GDCP during the execution process, and must advise the Commissioner and the Warden on whether they may proceed with an execution. Defendant Carr is being sued in his individual capacity for violations of Article I, Section 1, Paragraph V and Paragraph XI of the Georgia Constitution of 1983.

## FACTS

### A. GDC Restricts the Public Right of Access to Executions.

15.     GDC carries out executions at GDCP in a series of connected rooms. A diagram of the set of rooms used as part of GDC's execution protocol is reproduced below (Diagram 1):



| *Diagram 1* | |
|---|---|
| Room A | The "Witness Room" |
| Room B | The "Execution Chamber" |
| Room C | Room adjoining Chemical Room and Execution Chamber |
| Room D | The "Chemical Room" |
| Room E | *[room adjoining Chemical Room and Execution Chamber, not subject of this complaint]* |
| Room F | *[room adjacent to Execution Chamber, not subject of this complaint]* |
| Room G | *[room adjacent to Execution Chamber, not subject of this complaint]* |

16.     Georgia's protocol for carrying out the execution process is set forth in the LI

Procedures, the most recent version of which was issued in 2012. *See* Exhibit 1.

17.     The LI Procedures are comprised of two sections. Section I describes the process by

which the Warden of GDCP selects various medical and correctional personnel to carry out the

execution.

18.     Section II, with which this Complaint is primarily concerned, outlines the steps that must be taken on the day of an execution to prepare the condemned prisoner and carry out the death sentence.

19.     The steps outlined in Section II(B)-(D) concern the various actions taken immediately before the lethal drugs are administered, which are integral parts of the execution process.[4] Section II(E) describes the final steps of the execution, including the administration of the lethal dose of compounded pentobarbital.

20.     Section II(B) describes tasks that must be completed by GDC within two hours of an execution. These include delivery of the lethal injection chemicals to the Chemical Room (marked as Room "D" on Diagram 1) and an equipment/instrument check to be performed by the IV Team.[5] The LI Procedures currently provide no media witness access to the preparatory steps outlined in Section II(B) despite these steps being integral to and inextricably intertwined with the execution process.

21.     Section II(C) of the LI Procedures describes tasks to be performed within one hour of an execution. These include a second equipment/instrument check by the IV Team, preparation of syringes by designated staff members, and a test of the heart monitor. Again, the LI Procedures provide no witness access to these preparatory steps outlined in Section II(C) despite these steps being integral to and inextricably intertwined with the execution process.

22.     After the tasks in Sections II(B) & (C) have been completed, a single Media Monitor is escorted to the Witness Room (marked as Room "A" on Diagram 1) and, from behind a glass

---

[4] Section II(A) of the LI Procedures, to which Plaintiff does not seek access, involves safety, security, and communication checks between the Command Center, Execution Chamber, and the Front Gate of the Prison, as well as the Warden's inspection of the Execution Chamber and Witness Room.

[5] Per Section I(A)(5) of the LI Procedures, the IV Team consists of two or more personnel, including at least one nurse, who are trained to provide intravenous access.

window, visually observes the Execution Chamber (marked as Room "B") where the final

preparatory steps described in Section II(D) take place. This includes bringing the condemned

prisoner to the Execution Chamber, securing the prisoner to the gurney, and establishing (or

attempting to establish) intravenous access to the prisoner (hereinafter referred to as "the

Preparation of the Condemned").

23.     Defendants further limit access to the Preparation of the Condemned by preventing

the designated Media Monitor from having audio access to this part of the execution process; they

turn the microphone off during the Preparation of the Condemned, preventing the Media Monitor

from hearing sounds made by the execution team and by the condemned prisoner while Defendants

carry out these steps.

24.     Establishing intravenous access during the Preparation of the Condemned is often

the most fraught segment of an execution by lethal injection, as illustrated by recent events in

Alabama,[6] Idaho,[7] and the following Georgia examples:

> a.   Georgia executed Jose High by lethal injection on November 6, 2001.[8] According to
> one reporter witness, though executions are supposed to be "strictly scripted," Mr.
> High's execution procedure went "off the page for 15 minutes" when execution
> officials struggled to properly insert an IV line into his arm.[9] Eventually, a doctor had
> to "cut into" Mr. High to insert the IV.[10]

---

[6] In November 2022, the Governor of Alabama halted executions and ordered a "top-to-bottom"
review of Alabama's capital punishment system after a failed lethal injection, the third one since
2018. Difficulties establishing an IV line had been a recurring issue in these three proceedings, as
well as in other prolonged, but completed, Alabama executions. *See Alabama is pausing executions after a
3rd failed lethal injection*, The Associated Press (Nov. 21, 2022),
https://www.npr.org/2022/11/21/1138357929/alabama-executions-pause-lethal-injection.
[7] On February 28, 2024, Idaho officials halted the execution of Thomas Creech when medical team
members failed to establish intravenous access after multiple attempts. *See* Rebecca Boone, *Idaho
halts execution by lethal injection after 8 failed attempts to insert IV line*, The Associated Press (February 28,
2024), https://apnews.com/article/idaho-execution-creech-murders-serial-killer-
91a12d78e9301adde77e6076dbd01dbb.
[8] Sandy Hodson, *Executions Are Carefully Scripted*, The Augusta Chronicle (Oct. 20, 2009),
https://www.augustachronicle.com/article/20091020/news/310209938.
[9] *Id.*
[10] *Id.*

  b. Georgia executed John Hightower by lethal injection on June 27, 2007.[11] Again, prison officials had trouble finding a vein in which to insert the IV, prolonging the execution.[12]

  c. Georgia executed Curtis Osborne by lethal injection on June 4, 2008.[13] The procedure was delayed for two hours because prison officials could not identify a usable vein in which to insert the IV.[14]

  d. Georgia executed Brandon Astor Jones by lethal injection on February 3, 2016.[15] During Mr. Jones's execution, the lethal injection team had to insert the IV into his groin because they could not identify a vein to use in his arm.[16]

25. The foregoing examples demonstrate that establishing intravenous access is a point in the execution process at which complications regularly arise and where pain and suffering of the condemned prisoner can occur, heightening the need for both audio and visual media witness access to this crucial step in the execution.

26. Yet Defendants have arbitrarily limited observation of this step to only visual observation by a single Media Monitor, who Defendants require, when possible, to be from the county where the crime giving rise to the death sentence occurred.

27. The microphone in the Execution Chamber can easily be turned on during the Preparation of the Condemned, and the Witness Room can readily accommodate the other four media witnesses in addition to the Media Monitor. Indeed, immediately following the Preparation of the Condemned, Defendants permit four additional media witnesses representing the Associated Press, the Georgia Association of Broadcasters, and the Georgia Press Association to enter the same

---

[11] Harry R. Weber, *Killer Apologizes Before Execution*, The Associated Press (Jul. 12, 2007), https://coastalcourier.com/news/state-national/killer-apologizes-before-execution/.
[12] *Id.*
[13] The Associated Press, *Georgia Executes Man Who Killed 2 in 1990*, Access WDUN (June 4, 2008), https://accesswdun.com/article/2008/6/210545.
[14] *Id.* The execution was further delayed because the U.S. Supreme Court was considering his final appeal, which it ultimately rejected. *Id.*
[15] Rhonda Cook, *Georgia executes Brandon Astor Jones*, The Atlanta Journal-Constitution (Feb. 3, 2016), https://www.ajc.com/news/local/georgia-executes-brandon-astor-jones/jDioe9hdPGv2oj7mhVehnM/.
[16] *Id.*

Witness Room (along with other witnesses for the prisoner and the State) to observe the remainder of the execution process. Permitting auditory access and allowing all media witnesses to be present for the Preparation of the Condemned would allow media observers to more fully understand any problems that may occur during the execution process.

28.     Moreover, when Georgia executions were previously carried out by electrocution, all five media witnesses were allowed to witness the steps in the process during which the prisoner was brought into the Execution Chamber and strapped to the electric chair. Only once the State moved to using lethal injection did GDC limit access to the Preparation of the Condemned for an execution.

29.     Further, requiring that a reporter from the county where the crime occurred serve as the single Media Monitor frequently results in a reporter who is inexperienced in observing and reporting on executions serving as the sole source of contemporaneous information about the Preparation of the Condemned—including the crucial and often fraught step of establishing an intravenous line.[17]

30.     Relying on a single, often inexperienced, witness—who does not know what may be typical or abnormal about the particular execution being observed—impedes the complete and accurate capture and dissemination of information regarding the execution to members of the general public and to other members of the media, including Plaintiff. This problem is exacerbated by the elimination of auditory access to discussions about any problems that may be occurring, as well as to any statements or noises from the condemned that may indicate pain and suffering.

31.     Once intravenous access is established, Section II(D) provides for escorting the additional media and other witnesses to the Witness Room, the Warden delivering final instructions,

---

[17] The other media witnesses are representatives for the Associated Press, the Georgia Association of Broadcasters, and the Georgia Press Association. *See* https://gdc.ga.gov/Media/Scheduled-Executions.

the prisoner making a final statement, and the offering of a final prayer if requested by the prisoner. During these steps, the microphone in the Execution Chamber is only turned on for the prisoner's last statement. Auditory access is restricted for the other statements and communications.

32.    Section II(D) concludes with the Warden reading the Execution Order, advisement by the Attorney General or his/her designee of whether the execution can proceed, and instruction by the GDC Commissioner to the Warden as to whether the execution can proceed. During these steps, the microphone in the Execution Chamber is only turned on for the Warden's reading of the Execution Order.

33.    Section II(E) outlines the steps of administering the lethal injection.

34.    First, the Injection Team[18] in the Chemical Room injects a series of saline and drugs (compounded pentobarbital) into the intravenous ports. These liquids then travel through intravenous tubes that pass through the wall between the Chemical Room and the Execution Chamber and into the condemned prisoner's body.

35.    Media witnesses have no visual or auditory access to the Chemical Room and what is happening inside of it, including, but not limited to, the timing of the injections, the number of injections, the quantity of drugs used in the injections, the order of injections, and any concerns or complications that arise during the injection process.

36.    Without visual or auditory access to the Chemical Room, no media witness—and therefore no member of the public, nor Plaintiff—is privy to the critical parts of the execution process that happen there.

37.    Without access to the Chemical Room, media witnesses must rely on visual observation from their seats behind glass in the Execution Chamber to attempt to perceive when the

---

[18] Per Section I(A)(7) of the LI Procedures, the Injection Team consists of three trained GDC staff members. These staff members are not medical personnel.

lethal injection drugs begin flowing from the ports in the wall into the length of IV tubing and eventually into the prisoner, which is crucial information for determining how long the lethal injection takes to effectuate the prisoner's death. Without access to the Chemical Room, it is difficult-to-impossible for the media witnesses to detect these critical pieces of information.

38.     That detection is made even more difficult or impossible because the prisoner is covered with a sheet and strapped to the gurney with restraints on his arms, legs, and body. This makes it extremely difficult for a media witness observing through the glass to detect a prisoner's subtle physical movements that might indicate when the drugs have started to flow into their body.

39.     Verbal utterances or sounds by the prisoner that might indicate when the drugs have started to flow—or that the prisoner may make during the time (typically 12-to-15 minutes) it takes for the drugs to effectuate death—are also not audible to the media witnesses (unless loud enough to breach the glass window between the Execution Chamber and the Witness Room) because the microphone in the Execution Chamber is turned off during that process.

40.     Per Section II(E) of the LI Procedures, the IV Nurse monitors the prisoner in the Execution Chamber as the chemicals are flowing through the IV tubing and eventually into the prisoner's body. If there is a problem with the lethal injection, Section II(E) describes that the IV Nurse alerts the attending Physician, who alerts the Warden, who gives instructions to the Injection Team in the Chemical Room.

41.     There is no audio access to these communications because, as noted above, the microphone in the Execution Chamber is turned off for almost the entirety of the execution process and there is no visual or auditory access to the Chemical Room, where the Injection Team is located.

42.     Section II(E) next states that if the condemned prisoner is still exhibiting visible signs of life after the pentobarbital has been administered and a sufficient time for death has passed, the Warden shall instruct the Injection Team in the Chemical Room to administer additional

pentobarbital. Again, there is no auditory access to either the Execution Chamber or the Chemical Room for witnesses to hear these communications, nor is there visual access to the Chemical Room to see what or how many additional chemicals are being injected.

43.     Section II(E) further describes that the Warden and two Physicians shall enter the Execution Chamber and determine if death has occurred. Although witnesses can observe this occurring, communications between the Physicians and Warden are not audible to the media witnesses because the microphone in the Execution Chamber is turned off.

44.     If the prisoner is still exhibiting signs of life, Section II(E) provides that several steps of the lethal injection process shall be repeated. Again, the lack of auditory access to the Execution Chamber, coupled with the lack of auditory or visual access to the Chemical Room, prevent witnesses from hearing these communications or seeing the repetition of steps.

45.     Once the condemned prisoner is confirmed dead, the microphone in the Execution Chamber is turned on and the Warden announces the fact of death to the witnesses. The curtain is then closed over the window between the Execution Chamber and the Execution Witness Room.

46.     As illustrated by the foregoing recounting of the entire execution process, Defendants have arbitrarily decided what portions of the execution process they will allow media witnesses to see and hear, thereby denying them, and thus Plaintiff and the public, access to observe—both by sight and sound—the entire government proceeding.

47.      Defendants' foregoing arbitrary restrictions on the media witnesses' ability to see and hear the entire execution process obstruct Plaintiff and the citizens of Georgia from accurately knowing and understanding what occurs during a State execution.

48.     Remedying these restrictions is crucial to fostering transparency and constructive public debate regarding the State of Georgia's most solemn activity of putting to death one of its citizens. Remedying these restrictions is also necessary to give full effect to the constitutional right

for members of the public—media and otherwise—to speak, write, and publish on the entire

execution process.

**B. The State of Georgia Has a Long History of Providing Full Public Access to Executions.**

49.     Since the United States' inception, executions have traditionally been open to the

public. This has also been true in Georgia, where the first reported execution occurred in 1735 by

public hanging in Savannah's Wright Square.

50.     Since that time, Georgia has a well-documented history of both public and media

access to State executions. *See* Exhibit 2.

51.     For example, on July 18, 1857, the *Columbus Newspaper* reported that 5,000 people

gathered to watch a public execution in LaGrange, Georgia. *See id.* at 4.

52.     On November 12, 1872, *The Atlanta Weekly Sun* reported that an estimated 6,000

people were present to witness a public hanging. The reporter had intimate access to the condemned

prisoner, who at the gallows asked the reporter to mark down the prisoner's favorite hymn and send

it with his love to his wife. *See id.* at 8.

53.     On April 23, 1873, the *Elberton Gazette* documented the important role of the press in

reporting on executions, stating, "Disagreeable though the task will be to us, we will be on hand to

witness the execution, in order to give a full report of the same, which, though not pleasant reading

to the refined, is yet necessary to the history of the age we live in." *See id.* at 10.

54.     On July 2, 1873, *The Union & Recorder* in Milledgeville, Georgia documented and

decried the frequent media reports of public executions in Georgia:

> Never since we can remember, have we heard of so many hangings in Georgia in one
> year as in the past twelve months. . . We are decidedly of the opinion that the horrid
> details of murders and hangings as published in some of our sensational papers has a
> very bad influence upon a community. . . May we not attribute the frightful increase
> of crime in some degree as owing to these horrid details daily published… and to the
> frequent public executions in our midst?

*See id.* at 12.

55.     On May 19, 1883, *The New York Times* reported that 10,000 spectators gathered to watch a public hanging, noting that "[a] hanging in public in Georgia means a suspension of labor for a week in the adjacent country [sic]." *See id.* at 14.

56.     On September 29, 1883, *The Atlanta Constitution* documented the existence of much-in-demand media accounts of a public hanging: "[T]he particulars of the execution were eagerly sought for. The demand for the *Evening Times*, which contained a full account, was unprecedentedly large." *The Atlanta Constitution* further documented the intense public interest in attending the event: "Early in the morning immense crowds began to assemble about the jail, and applications for admission to the inclosure [sic] were numerous . . . . Some five hundred people obtained the coveted passes and flocked around the gallows." *See id.* at 18.

57.     On October 30, 1890, the *Washington Post* reported that 8,000 people gathered to watch the hanging of condemned defendant Tom Woolfolk, noting that "[t]his morning at 8 Woolfolk was taken from his cell into the jail corridor, where he talked for some time with a party of newspaper men." *See id.* at 20.

58.     An article published the same day by *The Atlanta Constitution* further documents that the media had access to all stages of the proceeding, noting that the reporter accompanied the sheriff to the jail to retrieve Mr. Woolfolk, rode next to Mr. Woolfolk in the carriage that transported him to the gallows, and accompanied him through the gate of the gallows and onto the scaffold. *See id.* at 22, 23.

59.     According to reports in *The Atlanta Constitution*, between 1884–1893, 40 executions in Georgia were conducted in public, enabling both reporters and other members of the community to

hear and see the proceeding. Michael A. Trotti, *The Scaffold's Revival: Race and Public Execution in the South*, 45 OXFORD UNIV. PRESS J. OF SOCIAL HISTORY, 195 (Fall 2011).

60.    And continuing into the 1900s, executions continued to be open to the public and to draw a large crowd. *See* Exhibit 2 at 24-25 (photograph of crowd gathered to witness a public hanging in Gwinnett County, Georgia).

### C. Public Access Plays an Important and Positive Role in Ensuring That Executions Are Conducted Humanely and Within the Bounds of the Law.

61.    The State of Georgia has administered the death penalty via lethal injection since 2001. Prior to this time, executions in the State were carried out by electrocution.

62.    Since roughly 2013, the State of Georgia has relied on compounded pentobarbital as the lethal drug the State administers to condemned prisoners.

63.    The pentobarbital used by the State of Georgia in carrying out executions is supplied by an unidentified compounding pharmacy.

64.    The origins, identity, and makeup of the ingredients used by the compounding pharmacy, as well as the identity of the pharmacy itself, are all designated as State secrets under O.C.G.A. § 42-5-36(d).

65.    The compounded pentobarbital used in Georgia's execution process is not subject to the Food and Drug Administration's manufacturing standards or drug approval process. This means that the compounded pentobarbital does not have to meet certain consistency, purity, potency, or other health and safety standards.

66.    The lack of transparency and resulting lack of public accountability surrounding the quality, safety, and preparation of the lethal injection drug itself heightens the need for media witness access to both see and hear the effects that occur when the drug is administered, so that the public receives complete and accurate information about executions carried out on their behalf.

67.     Furthermore, the nature of execution by lethal injection entails inherent risks of pain and suffering to the condemned prisoner which heightens the need for audio and visual media witness access to the entire execution process.

68.     For example, difficulty in locating and inserting an IV (discussed further below) can lead to a prolonged execution process that causes unforeseen pain and can even include a painful and bloody "cut-down procedure" in order to establish intravenous access.[19]

69.     As another example, an error in establishing IV access can cause the pentobarbital to escape into the subcutaneous tissue, causing unintended pain and delaying efficacy of the lethal injection drugs.

70.     As a further example, injection of compounded pentobarbital, like the State of Georgia uses, has been documented to cause flash pulmonary edema. This is a painful condition where an individual's lungs are suddenly filled with fluid making it extremely difficult for them to breathe. The lack of audio renders witnesses largely unable to determine whether this condition has occurred.

71.     Pulmonary edema "produces sensations of drowning and asphyxiation" and causes "extreme pain and needless suffering." *In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-145, Mem. Op. at 9-10 (D.C. Cir. July 13, 2020) (describing scientific evidence of flash pulmonary edema caused by pentobarbital injection).

72.     Autopsies from at least fifteen people executed in Georgia by compounded pentobarbital have revealed significant fluid congestion in the lungs, with at least seven showing signs of flash pulmonary edema.

73.     These risks inherent in execution by lethal injection intensify the need for auditory and visual access to the entire execution process in order for the media to effectively serve as the

---

[19] *See* footnote 6, *supra*.

eyes and ears of the public in observing the pre-death effects of the compounded pentobarbital on the prisoner.

74.    As an example of the important role that media can play in providing transparency and public accountability in the execution process, the State of Tennessee recently failed to test its lethal injection drug for toxins which experts said could cause respiratory failure or other distressing symptoms before death. After this was exposed by the media based on documents they obtained, the governor halted the execution process and appointed outside counsel to investigate the State's failings. *See* Nicholas Bogel-Burroughs, "Tennessee Halts Executions After Failing to Test Lethal Injection Drugs," THE NEW YORK TIMES (May 2, 2022), available at https://www.nytimes.com/2022/05/02/us/tennessee-executions-lethal-injection.html.

## COUNT ONE
### *Violation of Article I, Section 1, Paragraph V of the Georgia Constitution of 1983*
[Against All Defendants]

75.    Plaintiff incorporates and re-alleges paragraphs 1-74 above as if fully set forth herein.

76.    Article 1, Section 1, Paragraph V of the Georgia Constitution of 1983 declares that "[n]o law shall be passed to curtail or restrain in the freedom of speech or of the press. Every person may speak, write, and publish sentiments on all subjects but shall be responsible for the abuse of that liberty."

77.    Per this "plain language, the [media] is empowered to write and speak and publish on all subjects." *Georgia Gazette Pub. Co. v. Ramsey*, 248 Ga. 528, 529 (1981).

78.    "[T]he[se] protections of our own Constitution must remain paramount." *Id.*

79.    In no context is the right to speak, write, and publish more important than when reporting on government proceedings. *See Macon Tel. Pub. Co. v. Tatum*, 263 Ga. 678, 679 (1993) ("A

free press is necessary to permit public scrutiny on the conduct of government and to ensure that government operates openly, fairly, and honestly.").

80.     To afford full meaning and effect to the Georgia Constitution's freedom of speech and of the press, Article I, Section 1, paragraph V, must necessarily encompass a right of access to government proceedings.

81.     Giving the state and federal constitutional protections for speech, press, and related rights "the broadest scope that could be countenanced in an orderly society[,] [t]he press should be given the widest latitude possible in the exercise of its freedom that is consonant with the orderly administration of justice." *Atlanta Newspapers, Inc. v. State by Webb*, 216 Ga. 399, 404 (1960).

82.     The right of access under the Georgia Constitution attaches to executions carried out by Defendants on behalf of the State of Georgia.

83.     This is in part because the Georgia Supreme Court "interpret[s] a constitutional provision according to the original public meaning of its text, which is simply shorthand for the meaning the people understood a provision to have at the time they enacted it," *Olevik v. State*, 302 Ga. 228, 235 (2017), and at the time "freedom of speech" first appeared in the Georgia Constitution of 1861,[20] both members of the public and reporters had full access to criminal hangings. This access, in turn, enabled speech, writing, and publishing about these events. *See, e.g.*, Paragraphs 49-60 *supra* (newspaper accounts of public hangings from 1857 to 1873). Indeed, in 1859, two years before the 1861 Constitution was adopted, the Georgia Legislature had *rejected* a bill that would have mandated private criminal executions, thereby preserving their public, accessible nature.

---

[20] *See Maxim Cabaret, Inc. v. City of Sandy Springs*, 305 Ga. 187, 196 (2018) (Peterson, J., concurring); Ga. Const. of 1861, Art. I, Sec. 8 ("Freedom of thought and opinion, freedom of speech, and freedom of the press, are inherent elements of political liberty. But while every citizen may freely speak, write and print, on any subject, he shall be responsible for the abuse of the liberty.").

84.     Similar provisions that protected "freedom of speech" and "liberty of speech" appeared in the 1865, 1868, and 1877 versions of the Georgia Constitution,[21] during which time there continued to be public and media access to State executions, which allowed for speech, writing, and publishing about those proceedings. *See, e.g.*, Paragraphs 49-60, *supra* (newspaper accounts and photo of public hangings from 1872 to early 1900s).

85.     Considering this history and context, the right of access that is necessary to give full effect to the freedom of speech and press codified in Article 1, Section 1, Paragraph V of the Georgia Constitution of 1983 necessarily encompasses the right to see and hear the entire execution process carried out by Defendants on behalf of the State of Georgia.

86.     Yet, Defendants currently impose arbitrary and broad restrictions on media witness access to executions carried out by the State of Georgia.

87.     Defendants provide no visual or auditory access to the preparatory steps for executions outlined in Sections II(B) and II(C) of the LI Procedures, which includes checks of equipment and instruments to be used in the lethal injection.

88.     Defendants arbitrarily limit access to the Preparation of the Condemned described in Section II(D) of the LI Procedures to a single Media Monitor, who, when applicable, is from the county in which the underlying crime occurred. This frequently results in a reporter who has never previously witnessed an execution being the only person observing the Preparation of the

---

[21] *See Maxim Cabaret*, 305 Ga. at 196-197; Ga. Const. of 1865, Art. I, Sec. 6 ("Freedom of speech, and freedom of the press, are inherent elements of political liberty. But while every citizen may freely speak or write, or print on any subject, he shall be responsible for the abuse of the liberty."); Ga. Const. of 1868, Art. I, Sec. 9 (substantially the same); Ga. Const. of 1877, Art. I, Sec. I, Para. XV ("No law shall ever be passed to curtail, or restrain, the liberty of speech, or of the press; any person may speak, write, and publish his sentiments, on all subjects, being responsible for the abuse of that liberty.").

Condemned, including the crucial and sometimes difficult and painful step of establishing intravenous access to the condemned prisoner.

89.     Even the Media Monitor, moreover, has no auditory access to the Preparation of the Condemned aside from any sounds loud enough to be heard through the glass window separating the Witness Room and Execution Chamber.

90.     During and after the administration of the lethal injection, described in Section II(E) of the LI Procedures, Defendants arbitrarily limit media auditory access to the prisoner's last statement, the Warden's reading of the Execution Order, and the Warden's pronouncement of the prisoner's death.

91.     There is no auditory or visual access to the Chemical Room. This is the room where the compounded pentobarbital and the saline are injected into IV tubing that travels multiple feet from the Chemical Room, through a hole in the wall, and into the body of the condemned prisoner in the adjacent Execution Chamber. This is also the room where verbal communications take place between the members of the lethal injection team, the Warden, GDC Commissioner, and the State Attorney General's Office about the execution as it is in progress.

92.     The foregoing arbitrary limitations on auditory and visual access prohibit media witnesses from observing the entire execution process and therefore prevents them from providing a full and accurate account of the actions taken by the State to carry out the condemned prisoner's death; any complexities or complications that arise; significant sounds or communications from any of the people involved in the execution, including the condemned; and generally whether the execution was effectuated in a humane and lawful way. The limitations on media witness access in turn directly obstruct Plaintiff and the public's ability to have accurate and complete information about executions carried out by the State of Georgia.

93.     Allowing all five media witnesses to both see and hear the entire execution process carried out by Defendants on behalf of the State of Georgia—including all steps outlined in LI Procedures II(B)-(E)—is critical for Plaintiff's the public's ability to be accurately informed about this solemn and significant governmental action, and is therefore critical both for enabling public discussion regarding lethal injection and for ensuring that the executions carried out by the State are humane and lawful.

94.     The documented risks and challenges with conducting executions by lethal injection described in paragraphs 61-74 above further heighten the need for public transparency and accountability. This can only be achieved by providing media witnesses with full visual and auditory access so that they may accurately inform the public about the entire execution process.

## COUNT TWO

### Violation of Article I, Section 1, Paragraph XI of the Georgia Constitution of 1983
[Against All Defendants]

95.     Plaintiff incorporates and re-alleges paragraphs 1-94 above as if fully set forth herein.

96.     Article 1, Section 1, Paragraph XI of the Georgia Constitution of 1983 declares that "the defendant shall have a public and speedy trial."

97.     The right of public access to criminal proceedings is even more expansive than its federal counterpart. *See R. W. Page Corp. v. Lumpkin*, 249 Ga. 576, 578 (1982) ("Georgia law, as we perceive it, regarding the public aspect of hearings in criminal cases is more protective of the concept of open courtrooms than federal law.")

98.     The robust speech protections guaranteed by the Georgia Constitution, together with the steadfast right of public access to criminal proceedings afforded by Georgia law, further establish Plaintiff and the public's right of open access to executions conducted in Georgia.

21

## CONCLUSION

99.     In sum, Article I, Section 1, Paragraph V and Paragraph XI of the Georgia

Constitution require auditory and visual media witness access to the full execution process. This

includes auditory and visual access to Steps II(B)-(E) in the LI Procedures, access for all media

witnesses to the Preparation of the Condemned, and audio and visual access to the Chemical Room.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the court:

A.     Declare unlawful under the Georgia Constitution Defendants' imposition of

restrictions on media witnesses' visual and auditory access to the execution process carried out by

Defendants on behalf of the State of Georgia.

B.     Issue a temporary restraining order and interlocutory injunction preventing

Defendants and their agents from proceeding with executions under the existing protocols until

such time as they remove the unconstitutional limits on media witnesses' visual and auditory access

to the entire execution process.

C.     Issue further injunctive relief requiring Defendants and their agents to amend their

procedures so that:

> (1) All five media witnesses have visual and auditory access to the steps outlined in
>
> Sections II(B)-(D) of the LI Procedures, including establishing intravenous access to
>
> the prisoner and preparation of pentobarbital and other injections in the Chemical
>
> Room.
>
> (2) All five media witnesses have visual and auditory access to the Execution Chamber
>
> throughout the steps outlined in Section II(E) of the LI Procedures.

(3) All five media witnesses have visual access to the administration of injections in the Chemical Room (via closed-circuit camera or other remote means) and auditory access (via microphone or other remote means) to the Chemical Room.

D.    Grant Plaintiff such other and further relief as the Court deems just and proper.


Dated:        March 13, 2024
              Atlanta, Georgia

                                                        Respectfully submitted,


                                                        /s/ Gerald R. Weber
Cory Isaacson                                           Gerald R. Weber
Georgia Bar No. 983797                                  Law Offices of Gerry Weber, LLC
Andres Lopez-Delgado                                    Georgia Bar No. 744878
Georgia Bar No. 552876                                  P.O. Box 5391
Nneka Ewulonu                                           Atlanta, Georgia 31107
Georgia Bar No. 373718                                  Tel: (404) 522-0507
**AMERICAN CIVIL LIBERTIES**                            wgerryweber@gmail.com
**UNION FOUNDATION OF**
**GEORGIA, INC.**
P.O. Box 570738 |Atlanta, Georgia 30357
Tel: (770) 415-5490 | cisaacson@acluga.org


                                                        *Attorneys for Plaintiff*


23

## **CERTIFICATE OF SERVICE**

I hereby certify that on this day, I caused a true and correct copy of the within and foregoing to be filed with the Clerk of Court using the CM/ECF system, which will serve a true and correct copy of the same upon all counsel of record.

Respectfully submitted, this 13th day of March, 2024.

Cory Isaacson

*Counsel for Plaintiff*

## <u>VERIFICATION OF COMPLAINT</u>

I, Molly Greene, am the Strategy and Legal Director for The Appeal, and I am authorized to give

this verification on behalf of The Appeal. I further state under oath that I have reviewed the

Verified Complaint and that the paragraphs relating to The Appeal are true and correct to the best

of my knowledge and belief based on the information currently available to me.


_____

Molly Greene


Sworn to and subscribed before me

this _____7_____ day of _____March_____, 2024.


_____

NOTARY PUBLIC

My commission expires: